

**The Peregrine Corporation**

Specialists in Defense Dynamics

February 2, 2023

G. Ellis Summers, Jr., Esq.
Assistant Federal Defender
Office of the Federal Defender
Middle District of Florida
2075 West First Street, Suite 300
Fort Myers, FL 33901

Re.  <u>United States of America v. Zachary Johnson</u>

Dear Attorney Summers:

I am writing to provide my report in the above-referenced case.

**Preparation for Rendering Opinions.**  In preparation, I have reviewed various materials you have provided, including information on defendant's proposed voir dire, jury instructions, and the offenses with which defendant has been charged; email from the prosecution specifying the brand, type and size of pepper spray unit believed to be involved in the activities for which the defendant is charged; United States Capitol Police ("USCP") Use of Force directive number 1020.004, Effective Date 10/26/2016; OC Spray Orientation PowerPoint from USCP Training Service Bureau; USCP Training Services Bureau In-Service Training Lesson Plan on OC Spray (TSB Course Number 111.07); various USCP documents, marked as Exhibits 1, 6, 8, 9, 11, 12 and 13 (with redactions, USCP documents numbered between USCP-002-00000022, CAPD 000000689 and 000000705 but not including all numbers in that range); case decision in <u>Jones v. United States</u>, 67 A.3d 547 (2013); video entitled (in part) "Lower W. Terrace Door" (by its time line, Jan. 6, 2021 from 3:50 p.m. forward); video entitled "That's One Big Flag! The Storm Arrived Pt. 7"; and FBI document presenting the background and opinions of FBI Supervisory Special Agent Gerald Ken Western.

In addition, I read or reviewed various published articles and studies on the effects, effectiveness and safety of pepper spray (also called "OC" or oleoresin capsicum), the most relevant and significant of which for purposes of my work in this case are cited and discussed below.  Many of these are articles I have read previously in past years.

I also reviewed the manufacturer's website and product literature, including the MSDS (Material Safety Data Sheets) for the type of pepper spray unit used, and I spoke with the manufacturer.

I spoke with two other manufacturers of OC, among other things about the strength ratings of OC brands and types with which I have personally been sprayed.

Finally, I spoke with law enforcement training colleagues of mine who, like me, have personal experience in, or other reliable knowledge about, the pepper spraying of large numbers of individuals, to inquire about the types of injuries, if any, they have observed or of which they are aware in individuals who have been pepper sprayed. As discussed below, these include law enforcement trainers in Massachusetts, New York, New Jersey, Pennsylvania, Illinois, Wisconsin, Texas, California, Arizona and Oregon.

**Qualifications for Rendering Opinions.** I am of course also relying on my education, training, experience and qualifications with regard to law enforcement training, procedures, tactics, weapons and control devices, and use of force. In this regard, I note that I have been using firearms for the last sixty-five (65) years, since my father first taught me to shoot a rifle at the age of five. I have been firing handguns for over 57 years. I have been a professional firearms and use of force instructor for roughly 43 years, during which time I have trained what I conservatively estimate to be over 17,000 individuals, including police officers, federal agents, security officers, military personnel, and private citizens. During that time I have trained and certified thousands of police firearms and use of force instructors and law enforcement armorers.

I have been certified by the FBI, NRA, the State of New Jersey, the Commonwealth of Pennsylvania, and others as a law enforcement handgun instructor, shotgun instructor, patrol rifle instructor, counter-sniper rifle instructor, submachine gun instructor, and/or tactical firearms instructor, among other instructor ratings. In addition to my training with firearms, I have been trained and certified as an instructor in defensive tactics (unarmed self-defense and subject control techniques for police), baton (with two styles of police batons), pepper spray, as a Taser Master Instructor, as a less lethal impact munitions instructor, weapon retention instructor (weapon retention being the officer's ability to retain or regain control of their weapon when an attacker is attempting to disarm them), and trained in emergency vehicle operation and pursuit and counterterrorist driving by three nationally-recognized training schools. I thus have a background in the full range of law enforcement and security use of force modalities. I have testified as an expert in many cases involving officers' decisions to use, or not to use, defensive tactics, pepper spray, baton, Taser and firearms.

I myself have successfully completed firearms and tactics courses taught by the FBI, the U.S. Marshals Service, the Department of Defense Police, the Bureau of Alcohol, Tobacco, Firearms & Explosives, the NRA Law Enforcement Activities Division, the U.S Army Marksmanship Training Unit (Instructor Group) at Fort Benning, Glock, H&K, ASLET, IALEFI, ILEETA, and many of the world's leading firearms instructors and private training academies.

Agencies for which I have trained and certified law enforcement firearms and use of force instructors include the New York State Police, Oregon State Police, Louisiana State Police, Missouri Highway Patrol, Washington D.C. Metropolitan Police, Massachusetts Metropolitan Police, North Carolina Justice Academy, Pennsylvania Municipal Police Officers Education & Training Commission ("MPOETC"), and the police departments of Philadelphia, Baltimore, Miami, Jacksonville, St. Petersburg, Dallas, Trenton, Jersey City, Atlantic City, Seattle,

2

Spokane, Tacoma, Salt Lake City and County, the New Jersey Department of Corrections, the Nevada State Fire Marshal's Office, Tennessee Bureau of Investigation, Metropolitan Toronto Police Service (Emergency Task Force and Dignitary Protection Unit), Calgary Police Service Tactical Unit, and many others.

For the past 25 years I have been a sworn, armed reserve deputy sheriff for sheriff's departments in the two states where I have lived, during which time I have performed a wide variety of law enforcement tasks, ranging from routine patrol and traffic enforcement, prisoner security and transports, and service of search warrants and arrest warrants, to response to a wide variety of calls for service, including response to crimes in progress. I have been involved in traffic stops and DUI stops of vehicles, vehicular and foot pursuits, and barricaded gunman situations, including incidents culminating in the arrest of dangerous suspects at gunpoint. In my sheriff's department service I have carried pepper spray, batons, Tasers, handguns, shotguns, and patrol rifles.

I have been a regular presenter at regional, national and international conferences of law enforcement instructors, including ASLET, IALEFI, and ILEETA. I taught classes at the recent IALEFI Annual Training Conference in Melbourne, Florida and at the ILEETA Conference in St. Louis, Missouri, where I was a panelist on both the ILEETA Deadly Force Panel of Experts and the ILEETA Active Shooter Panel of Experts.

I have authored over 120 published articles in the firearms and tactics field, was Technical Editor for several years of The Police Marksman magazine, am the principal author of Firearms Training Standards for Law Enforcement Personnel, the Associate Editor of Standards & Practices Guide for Law Enforcement Firearms Instructors, and the principal author of the IALEFI Guidelines for Simulation Training Safety. For about the past thirty-five (35) years I have served on the Board of Directors of the International Association of Law Enforcement Firearms Instructors (IALEFI). I am currently that organization's First Vice President and Chairman of its Instructor Criteria Committee. I have formerly chaired its Safety Committee and its Firearms Training Standards Committee.

I assisted the Commonwealth of Pennsylvania in developing and writing the firearms and use of force curriculum used at all of Pennsylvania's 22 municipal police academies for a period of over 15 years, and thereafter assisted in the updating of that curriculum. I was one of the authors of the Pennsylvania MPOETC's Patrol Rifle Guidelines distributed to law enforcement agencies throughout the state. I was one of the four subject matter experts who developed the MPOETC's mandatory in-service "Police Use of Force" training program taught in 2016 to some 24,000 police officers statewide, including assisting in teaching the pilot program and instructor training programs for that course.

I taught the curriculum segment entitled "Use of Force in Law Enforcement" in the recruit training program at the Allentown (PA) Police Academy for about seven years. That program addressed all commonly used law enforcement force modalities, including defensive tactics, pepper spray, baton, Taser, and firearms.

I designed and taught a senior seminar entitled "Police Use of Force" in the Criminal Justice Department of Indiana University at Bloomington, Indiana, for two years while I lived in Indiana. The seminar addressed pepper spray as one force option available to police.

I taught use of force law and tactics in a two-and-a-half-year series of classes for Senior Firearms Instructors of the Bureau of Alcohol, Tobacco & Firearms, presented at various locations on the East and West Coasts including San Diego, Orlando, San Francisco, and Los Angeles.

I have taught a variety of use of force topics at regional, national, and international law enforcement training conferences nationwide for some 37 years, and have attended numerous training classes and courses on the use of force ranging in length from an hour, to week-long courses, to one course that involved on-site and remote videoconference training sessions, with written assignments, oral presentations and testing over a five-month period.

I assisted the Commonwealth of Pennsylvania in a program to purchase seven electronic video shooting/decision making simulator systems, which were put in place in seven locations throughout the state. The systems included the use of pepper spray as a force option. My work in that program included training use of force instructors to run these simulators, and conducting the pilot training program.

When I lived in Indiana and was a reserve deputy sheriff there, I obtained the use of an electronic video shooting simulator, trained an instructor cadre, and ran shooting simulations not only for our sheriff's department, but for all other law enforcement agencies in the county, two years in a row. Those simulator systems also included pepper spray as a force option. Our County Prosecutor's Office also had me conduct classroom in-service training in use of force, attended by officers and deputies from all law enforcement agencies county-wide.

Here in Pennsylvania, our District Attorney's Office has on three occasions had me conduct firearms, tactics and use of force training for assistant district attorneys (and for the elected District Attorneys themselves) to better enable them to analyze and properly deal with use of force incidents. I have conducted several Pennsylvania Continuing Legal Education ("CLE") programs on use of force and law enforcement training and tactics for attorneys, prosecutors, and judges. I have conducted and assisted in conducting man-on-man "reality-based training" ("RBT") use of force simulations for law enforcement officers and others. This past year I conducted video shooting simulator decision making training for approximately 40 police and armed security officers, using the mobile electronic simulator system from Harrisburg Area Community College's Law Enforcement Training Center. That simulator system included not only firearms, but pepper spray and Taser as force options available to the trainee. I have authored a published and widely-used set of safety guidelines for simulation training (see above), and am currently chairing a committee that is updating and enlarging those standards. I have written and assisted in writing firearms, pepper spray, Taser and use of force policies for my sheriff's department and other agencies, and have for over 20 years chaired our sheriff's department's shooting review boards, reviewing and making determinations regarding the justification for officer-involved shootings.

4

I am certified in Shooting Scene Reconstruction, and I have testified in courts for many years on issues of shooting scene reconstruction. The field of shooting scene reconstruction makes use of physical evidence, scientific knowledge and investigation to reconstruct how a shooting likely occurred, including the directions and locations from which the shots were fired, the trajectories of the projectiles, the order of the shots when this can be determined, ricochets, the effects of intervening barriers such as window glass or automotive glass, clothing, or partitions in buildings, the speed with which the shots were or could have been fired, movement of the involved individuals during the shooting, whether a shooting appears to have been accidental or intentional, the causation of the shooting if accidental, etc. The physical evidence used includes such things as the location, direction and characteristics of bullet damage to physical objects, the location, direction and characteristics of bullet wounds to people, the location of ejected cartridge cases and other ballistic evidence, the inspection and characteristics of the firearms used, the known ballistics of the firearms and cartridges, chronographing the velocity of the projectiles used, the location and condition of recovered projectiles, cartridge cases and other ballistic evidence, ejection pattern testing of the incident firearm(s), proximity-to-muzzle testing, testing for lead and gunshot residue, analysis of video and audio evidence when available, witness interviews and testimony when available and to the extent it may be reliable, etc.

I am also certified as a Force Science Analyst, and as an Advanced Specialist in Force Science. I have regularly testified in courts on force science issues. In fact, I testified on such issues for many years before there was such a certification course or any certification in the field that, by then, had been named "force science." The field of force science is the application of scientific principles, research and testing to confrontations in which force is used by police officers or others. Force science involves human factors such as reaction time, the speed with which one can cover a certain distance on foot, turn, draw and/or fire a gun, the speed at which multiple shots can be fired, the relative speed of one individual's action compared to another individual's reaction to it (so called "action vs. reaction" – one aspect of so-called "reaction time"), and an individual's perception and evaluation of deadly threats. I have, since the early 1980's, electronically timed the performance of a wide variety of shooting skills and actions, including the drawing and firing of handguns from a variety of holsters, positions and locations, both as performed by myself and by hundreds of my students and others, ranging from beginning firearms users to instructors, SWAT officers, and other highly-trained individuals. Force science also includes the study of the perceptual and physical changes commonly experienced by individuals during high-stress use of force confrontations, sometimes described as part of the "fight or flight syndrome" or Body Alarm Reaction ("BAR"). These stress-caused reactions, including such things as increased rates of respiration and heart rate, loss of fine motor ability and coordination, tunnel vision, and auditory exclusion, have been well researched for years, are the subject of numerous articles in scholarly, scientific and professional journals and books, and have been part of the curriculum taught to law enforcement officers, instructors, and criminal justice students nationwide for decades, some of which curriculum I have helped to write and teach. In many respects, these well-recognized stress effects also form the basis for the tactics and techniques which law enforcement officers are trained to use, as the officer's abilities – and disabilities – under stress must be taken into account in designing and selecting techniques the officer is expected to use in the stress of life-and-death confrontations. I also note that in addition to studying these stress effects in academic settings, I have experienced some of them

5

myself, have observed them in trainees, and have observed them in officers and others I have debriefed or interviewed following shootings and other use of force incidents.

In this case, I have been asked to provide an opinion regarding the effects of pepper spray, also known in the law enforcement community as "OC" or oleoresin capsicum. I have carried pepper spray in both of the sheriff's departments for which I have served over the past 25 years. I have also carried pepper spray for personal self-defense use on a daily basis for over 30 years. I was Director of Security in charge of an 11-man armed executive protection team equipped with both firearms and pepper spray. I have successfully completed and been certified in a Law Enforcement Chemical Munitions Training Program (AAI Corporation 1988), an Aerosol Chemical Restraint ("OC") User Class (Wernersville Police Department 1993), and an OCAT (Oleoresin Capsicum Aerosol Training) Instructor Course at Harrisburg Area Community College's Law Enforcement Training Center (1996). I have over the past 25 years conducted many OC training classes, with various brands, types, and forms of pepper spray and pepper gel, for security officers in the pharmaceutical, steel manufacturing, health care, and public utility industries, as well as for security teams and staff in schools and houses of worship, and sometimes for private individuals. I have personally pepper sprayed dozens of trainees in these classes. I have seen criminal suspects pepper sprayed in police actions, and have pepper sprayed two individuals myself. In my pepper spray training and expert witness work, I have personally been sprayed, and have seen others sprayed, with various brands, strengths and types of OC, including mist, stream, splatter-stream, foam and gel units. I have seen demonstrations of pepper ball guns by their manufacturers. Several manufacturers of pepper spray units and pepper ball guns have sent me their products for test and evaluation. I have evaluated pepper spray units for their effectiveness, usability, flammability of contents, and safety in practical use. Brands of pepper spray with which I have had personal experience include MSI-Mace, CAP-STUN, Aerko, Guardian, Smith & Wesson, Bodyguard, ASP, Disabler 10-13, Spitfire, Pepper Power, Federal Laboratories, Federal Cartridge Company, Defense Technology (First Defense), Fox Labs, Sabre (Security Equipment Corporation), Kimber Pepperblaster, and others. I have experience with and/or have evaluated OC units ranging in size from ballpoint pen and keychain size units, kubaton-type units, through "jogger" units, police duty belt canisters (MK-3, 4 and 5 size), "crowd control" fire extinguisher-type units, pepperball guns made by various manufacturers, and OC dispensers designed to be incorporated into the construction of vehicles, schools, and correctional facilities. I have provided training or consulting services of one sort or another to literally hundreds of law enforcement agencies, and thousands of law enforcement and security officers, who have used OC in one form or another, and have gotten a great deal of feedback from them about their experience with OC and its effectiveness. I currently have in my inventory 60 or more OC units of various brands, types and sizes, including both live and inert training units. I have worked as an expert witness in several cases in which pepper spray has been used by police, corrections officers, and/or private citizens ("civilians"). I have watched many videos of people being pepper sprayed in law enforcement incidents, both in cases in which I have served as an expert and in other police incidents, as well as in training classes, training videos and demonstrations. I have written and consulted on pepper spray training and use policies for security and law enforcement agencies, and on product warnings and directions for use by pepper spray manufacturers. Finally, over roughly the past 30 years I have read and reviewed numerous studies and articles concerning the effects, effectiveness and safety of various pepper spray products.

One of my recent consulting engagements was to organize, train and write use of force policy for an armed, proprietary security team for a large regional health care provider, operating several hospitals and serving over 2 million patients annually. Another of my recent security consulting engagements was to perform similar work for a multi-billion-dollar public utility, operating in several states. I trained officers for both organizations in the use of pepper spray.

I have served as an expert witness for the past 38 years in state and federal courts nationwide, including work in many cases involving shootings and use of force by police, security officers, and private individuals. In total, I have served as an expert in over 400 cases, and have testified nearly one hundred (100) times at trials in state and federal courts throughout the United States, in addition to testimony before many grand juries, Police Boards, arbitration courts, federal and state administrative tribunals, state legislative committees, and by invitation before committees of both Houses of the United States Congress. I have been qualified as an expert by state courts in California, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, West Virginia, Tennessee, Georgia, Florida, Louisiana, Arizona, Wisconsin, Michigan, Minnesota, Ohio, Iowa, Kentucky, Mississippi and Illinois, and by federal courts in California, Connecticut, New York, New Jersey, Pennsylvania, Maryland, Tennessee, Louisiana, Arkansas, Florida, Montana, Illinois and Oregon. In total I have been qualified and have testified as an expert in some 14 federal courts in 12 states, and in some 46 state courts in 22 states, as well as in the District of Columbia. In some locations I have testified in multiple cases before the same court. I have also served as an expert in cases that have been dismissed, settled, plea bargained, or for some other reason have not gone to trial or otherwise have not required my trial testimony, in at least 22 other states, Puerto Rico, the U.S. Virgin Islands and Canada.

While I am working in this case as an expert on behalf of a criminal defendant, I have many times worked as a prosecution witness ("state's witness") in New Jersey, Pennsylvania, Georgia, South Dakota, Wisconsin, and Tennessee. I have worked as an expert in cases for law enforcement agencies and officers, and have also testified many times against law enforcement agencies and officers. In civil cases, I have worked for both plaintiffs and defendants, both for and against firearms manufacturers and holster manufacturers, and both for and against shooting ranges and gun clubs. In other words, my testimony and my opinions are not "one sided." Because of this, I have many times been asked by prosecutors in several states to perform independent evaluations of shooting cases, to assist them in determining whether or not the police officer(s) or others involved should be criminally charged.

Further details of my education, training, experience and qualifications are contained in my curriculum vitae, provided along with this report.

**Incident Details.** The incident(s) giving rise to this prosecution occurred during the January 6, 2021 demonstration and riot at the U.S. Capitol Building in Washington, D.C. I understand it is alleged that defendant Zachary Johnson ("Johnson") was in the vicinity of the standoff between police and demonstrators at the lower west terrace tunnel, and that he passed up from a demonstrator behind him to a demonstrator ahead of him a crowd-control size OC unit that was later used by someone other than Johnson to spray OC at the police. My understanding

7

is that this OC unit had come into the hands of demonstrators after it was abandoned by the police.

**Assignment.** I have been asked to provide information to assist the Court and/or finder of fact in determining whether an OC unit of this type is a deadly or dangerous weapon under the law pursuant to which Johnson has been criminally charged.

**Executive Summary.** Since the mid-1980's, pepper spray or "OC" has been widely used throughout the United States and other countries as a non-lethal control device or weapon by law enforcement and security agencies, and for self-defense by private individuals (that is, non-police or "civilians"). During that time, hundreds of thousands of individuals – or more – have been pepper sprayed. In the overwhelming majority of these instances of pepper spray use, there have not only been no serious bodily injuries caused by the pepper spray, but no lasting effects after a relatively short period of time following the exposure. Pepper spray is not a dangerous or deadly weapon as those terms are commonly used in law enforcement use of force training and policy.

## Discussion and Analysis

**Description and History of Pepper Spray.** Pepper spray (also called "OC" or oleoresin capsicum by police) first came into law enforcement use as a non-lethal subject control weapon in the United States in the 1980's. Some sources indicate pepper spray was first developed to control non-human threats, such as bears and vicious dogs. The U.S. Postal Service has issued pepper spray for years to letter carriers for use in repelling attacking dogs. See U.S.P.S. website, https://about.usps.com.

By the early 1990's, pepper spray was "gaining acceptance and popularity among law enforcement officers and police agencies as a safe and effective method of incapacitating violent or threatening subjects," *Oleoresin Capsicum: Pepper Spray as a Force Alternative*, National Institute of Justice Technology Assessment Program, March 1994. Studies showed reduced subject injuries and reduced officer injuries in agencies using pepper spray. As of 2013, "an estimated 94% of all [U.S.] police departments had authorized the use of pepper spray, including 100% of all forces in jurisdictions with populations of 500,000 or more." *Pepper Spray: Research Insights on Effects and Effectiveness Have Curbed Its Appeal,* National Institute of Justice, May 1, 2019. The use of pepper spray by U.S. law enforcement agencies has declined in recent years as the Taser has come into more widespread use as a non-lethal force alternative.

The active ingredient in most pepper sprays is oleoresin capsicum ("OC"), a non-toxic, organic extract of hot peppers, including chili peppers, of the genus *capsicum*. There are 20 or more varieties of capsicum peppers, some of which are cultivated for their use as spices in the culinary industry. Capsicum peppers are also the source of capsaicin, used in various topical analgesic liniments and ointments used for relief of joint and muscle pain, such as the classic Bengay and similar products. OC can also be produced synthetically by chemical processes. When I was first trained in the use of OC sprays in the early 1990's, it was stated that the capsicum peppers used to produce OC in the United States were grown in Central and South America. An industry source now tells me that almost all of the capsicum peppers used for

current OC production in the United States are imported as food grade, finely-ground peppers in 55-gallon drums from two sources in India, where the peppers are now grown.

An organic solvent, typically ethanol ("grain alcohol") is used to extract the capsaicin from the ground capsicum peppers. The alcohol is then evaporated off, leaving the waxy residue which is capsaicin-containing oleoresin capsicum ("OC"). The OC is then processed with an emulsifier, commonly propylene glycol, which is "generally recognized as safe" by the U.S. Food and Drug Administration (FDA 2017). The emulsifier allows the OC to be suspended as tiny droplets in a carrier liquid, most commonly either water or alcohol. Water is the preferable carrier, as using alcohol for this purpose may result in the pepper spray being flammable, with the risk that it could be ignited if used in the vicinity of an ignition source such as a stove, barbecue grill, candle, spark from a Taser, cigarette, or muzzle flash from a firearm. The carrier liquid containing the tiny droplets of OC is then put into aerosol spray canisters, and pressurized with a gas. Nitrogen, which is a non-flammable gas, is often used for this purpose. Depending on the formulation of the canister's contents and the type of nozzle and orifice used, the OC may be discharged from the canister as an aerosol mist, a "ballistic stream," "splatter stream," pepper foam, or pepper gel. OC in dry powder or liquid form is also loaded into spherical, breakable "pepper balls," which can be launched from pepper ball guns, typically $CO_2$ powered, for crowd control by police or self-defense by private individuals. When the pepper balls strike the subjects or surrounding objects, they break open to release the OC. Larger OC projectiles can also be fired by police from 37mm and 40mm launchers for use in riot control and against barricaded suspects.

**Defense Technology "First Defense" MK-46 OC Unit.** Based on information provided by the prosecution, and on my review of the incident videos, the OC unit involved appears to be a Defense Technology "First Defense" MK-46 aerosol OC projector. "First Defense" is a line of OC products sold by Defense Technology, LLC, a company located in Casper, Wyoming whose law enforcement products are used throughout the United States and elsewhere. Until recently, Defense Technology was owned by Safariland, a major manufacturer of law enforcement holsters, body armor, and other police products. The designation "MK-46" indicates that the unit contains 46 ounces ("formulation weight") of contents. The unit looks like a small fire extinguisher, with an aluminum canister containing the OC formulation, and a lever-type actuator. When the actuator is pressed, the OC is discharged in a stream. Two variations of the MK-46 OC unit, differing in the direction in which they discharge the OC stream, are available from the manufacturer. One option is the MK-46H, in which the tank, when held in a horizontal position (thus, the "H"), discharges the OC stream in a horizontal direction. This appears to be the type of OC unit observed in the January 6 videos provided to me. The other option, the MK-46V, is similar to a standard small fire extinguisher, in which the canister, when held in a vertical position (thus, the "V"), discharges the OC stream in a horizontal direction. Both units have a tank diameter of 4.25". The MK-46H has a height (length) of 16.5", while the MK-46V has a height (length) of 19.25". The manufacturer's product information states the effective range of either unit to be 25-30 feet. To comply with shipping regulations, the units are shipped to the law enforcement agency, dealer or distributor unfilled (empty) and unpressurized. The dealer or agency then fills the unit with the liquid "refill" (OC formulation) provided in a plastic jug by the manufacturer, and pressurizes the unit with nitrogen. The unit can be refilled and re-used many times. The MK-46 refills are available in a range of OC strengths (see below), including 0.2%,

9

0.4%, 0.7%, 1.3%, and a mixture of 1.3% OC with 2% CS (orthoschlorobenzalmalonitrite) teargas. My understanding is that the MK-46 unit at issue in this case contained the 1.3% OC formulation.

**Effects and Effectivness of OC.** Police officers and others using OC spray are instructed to aim for the attacker's eyes and face. The OC is variously called an "irritant" or "inflammatory" agent, as it irritates or inflames the mucous membranes in and around the eyes, nose, throat and airways. On human subjects on whom it is effective, OC will, within several seconds of contact, cause an involuntary shutting of the eyes. This assists police in controlling and arresting assaultive suspects, and can allow private individuals using OC for self-defense to escape from criminal attackers. Other physical effects of OC exposure that are often, but not always, seen can be a runny nose, coughing, difficulty in breathing, and a burning sensation in sensitive skin areas, including the face.

In many cases the OC will not affect a subject instantaneously, but a subject sprayed in the face with OC will be affected within about 3-5 seconds. Unfortunately, this delayed effect may still allow a subject armed with a knife, gun or other weapon to do significant harm before the OC takes effect. And while OC is very effective against some individuals, others are barely affected by it, or do not appear to be affected at all. Studies of OC use as a law enforcement force alternative have shown highly variable results, ranging from effectiveness in as many as 85% of incidents in which it has been used, to as few as 20% of incidents. See *The Effectiveness and Safety of Pepper Spray*, U.S. Department of Justice, Office of Justice Programs, April 2003, p. 10.

Depending on the individual, the degree of exposure, the brand and type of OC, and other factors, the duration of OC's physical effects usually ranges from about 20 to 90 minutes. Most individuals recover from the worst effects of the OC within 30-45 minutes. The steps recommended to hasten recovery from the effects of OC include:

- Move the individual to an area with fresh air, or in front of a fan.
- Flush the eyes and face with copious quantities of cool water, first removing contact lenses if worn.
- Remove/replace any clothing that has been saturated with pepper spray.
- Do not rub the eyes.
- Do not use salves, creams or ointments that can trap the pepper next to the skin.
- A mild soap, such as baby shampoo, can be used to help wash the OC from the skin and hair.
- In police use, reassure the subject that the effects of the OC are temporary, and that the discomfort will soon subside.

**Strength of OC Formulations.** There is no universally-accepted method by which manufacturers measure or advertise the strength ("hotness" or effectiveness) of their OC products. Several methods are used, which are inconsistent and confusing. Some manufacturers advertise and/or label their OC products by the percentage of liquid OC formulation added to the total liquid contents of the cannister. For example, the "Disabler 10-13" brand of pepper spray is labeled as containing "15% Red Pepper." Its manufacturer tells me that the 15% figure "is a

10

derivative before being broken down." The U.S. federal government uses percentages by dry weight of the capsaicin before being emulsified and put in suspension in the liquid contents of the OC formulation. The range of available First Defense MK-46 formulations, from 0.2% to 1.3%, represent these percentages. A source at MSI Mace advises that OC spray for use against humans has a maximum of 1.4% OC when measured in this way. New York State limits civilian (i.e., non-law enforcement) self-defense units to not more than "0.7% total capsaicinoids," see New York Codes, Rules and Regulations, Vol. A-1, Title 10, SubChapter D, Part 54, Section 54.3). OC spray for use against dogs, such as is issued by the U.S. Postal Service to letter carriers, typically has a strength range of 0.66% to 0.7%. Bear spray, which the EPA classifies as a pesticide, is required to be within the range of 1.0% to 2.0% capsaicin and major capsaicinoids.

A shortcoming of both of the measurement methods described above (percentage of active ingredient formulation in the total liquid contents of the OC unit, or percentage of OC in the liquid contents) is that neither method accounts for the fact that some capsicum peppers, and thus some capsaicin, will be "hotter" (spicier) than others. For many years the standard for "hotness" of pepper spray was (and for many manufacturers still is) measured and advertised in Scoville Heat Units, or "SHUs." This is a measurement using the Scoville Organoleptic Test developed by American pharmacist Wilbur Scoville in 1912. In the test, the capsaicin is first extracted from the peppers using alcohol as a solvent, then diluted with sugar water, then tasted by a panel of five experienced pepper growers or pepper eaters in decreasing percentages in the solution until at least three of the five tasters can no longer taste the pepper. As examples, common jalapeno peppers range from about 2,500 to 5,000 SHUs, Original Tabasco sauce also about 2,500 to 5,000 SHUs, some habanero peppers close to 350,000 SHUs, ghost peppers to over 1,000,000 SHUs, and most OC spray used by law enforcement from about 2,000,000 to 3,000,000 SHUs. One manufacturer, Fox Labs, which says it makes "the hottest pepper spray in the world," advertises its product at 5,300,000 SHUs.

Because the measurement of pepper spray product "hotness" by the Scoville Heat Unit scale appears to be subjective and imprecise, in recent years some manufacturers, including Sabre, Defense Technology and others, have instead turned to high performance liquid chromatography ("HPLC") performed in testing laboratories, or other scientific analysis methods, to test the strength of their products. The Defense Technology product literature for the MK-46 OC unit states that the manufacturer:

> … no longer recognizes Scoville Heat Units (SHU's) as a viable means to measure heat in regards to pepper spray (OC). SHU's are a measure based on the perception of heat which is assigned to various peppers by a panel of five tasters as described in the American Spice Trade Association, Analytic Method 21.0. The only true way to determine the heat value of a pepper is by laboratory assay of Major Capsaicinoids.

The 1.3% rating of the First Defense MK-46 unit in this case is within the percentage range of OC sprays typically used by both law enforcement and the private sector.

11

**Placement of OC on the Use of Force Continuum.** In many law enforcement agencies, academies, training programs, and written use-of-force policies, a schematic called a "use of force continuum" is used to help officers understand the concept that there are lower-level and higher-level uses of force, and that some uses of force are more invasive, and more likely to cause serious injury, than others. While the titles given to the various steps on the use of force continuum may vary somewhat from one state, law enforcement agency, or academy to another, levels of force in many agencies, from lowest to highest, are often expressed as follows:

1. Officer presence (arrival of uniformed officer, display of badge/ID, marked car)
2. Verbal direction (requests by officer, directions, commands)
3. Physical restraint and control (joint locks, come-along holds, handcuffs, etc.)
4. Intermediate force (kicks, strikes, baton, Taser, impact munitions, bite & hold K-9s)
5. Deadly force (firearms, intentional baton strikes to head or neck, etc.)

Depending on the state and agency, OC is typically placed either at Level 3 ("Physical Restraint and Control") or at Level 4 ("Intermediate Force") on the Force Continuum. For many years, my home state of Pennsylvania placed OC at Level 3, Physical Restraint and Control, because unlike kicks, forearm strikes, baton strikes, and the use of K-9s to bite and hold resistant or assaultive subjects, the use of OC typically results in no physical injury to the subject, only temporary discomfort and, hopefully, incapacitation. Some other states place OC at Level 4 (Intermediate Force) along with the Taser, but differentiate it at that level from other Intermediate Force options such as the baton, strikes or kicks that will usually cause injury, although not deadly injury, to the suspect. I know of no state, law enforcement agency, training academy or instructor that places OC at Level 5 (Deadly Force) on the Force Continuum.

In many law enforcement agencies, when dealing with a physically capable suspect who verbally resists the officer's announcement that the suspect should submit to arrest, the officer would pepper spray the suspect before making any attempt to "go hands-on" to physically control and handcuff the suspect. In other words, if the officer's command to the suspect to "Turn around and put your hands behind your back" is met with a response such as clenched fists, the suspect assuming a fighting stance, or utterance of words such as "F--- you, I'm not going!," the officer would then immediately pepper spray the suspect, before making any attempt to physically control the suspect and handcuff him. This is because pepper spraying the suspect at that point is the action that would be least likely to result in any physical injury to either the suspect or the officer than any other force option the officer could use. Today, in many agencies, OC spray has been replaced by Taser as the non-lethal force alternative of choice. However, the fact remains that pepper spray is a very low-level use of force, largely because it almost never results in any physical injury to the suspect, only temporary discomfort and, hopefully, temporary incapacitation sufficient for the officer to control and handcuff the suspect.

**OC Training.** Training with OC, whether for police, security officers, or private individuals, will usually start with classroom instruction explaining the nature of OC, when and how it should be used, its effects, and the steps that can be taken to hasten recovery from its effects. The classroom instruction is typically followed by hands-on training in which OC "training units" containing pressurized "inert" liquid that has no pepper in it are sprayed at targets, to familiarize the user in OC tactics, the operation of the OC unit, and to teach the user

12

the effective range of the unit. Many OC training programs for police and security officers, as well as most OC instructor programs I am familiar with, also include the trainees being sprayed with "live" OC units – that is, units containing pepper – to familiarize the trainees with the effects of OC, and with the steps used to hasten recovery from those effects.

Another major reason for spraying police and security recruits and officers with live OC is to teach them that they can still function effectively after being sprayed. For example, I have participated in programs, and have observed and learned about others, where after being sprayed with OC, the officer must perform tasks like delivering baton strikes, kicks or forearm strikes to a heavy bag, running to another location, using his radio, drawing his handgun and dry firing at a target. Trainees are taught that in order to perform tasks like running or firing their handgun that require eyesight, they may have to use their thumb and forefinger to hold their eyelid open if the effects of the OC would otherwise cause them to shut their eyes. I note that while some sources describe OC as "temporarily blinding" someone sprayed with it, in my experience and that of many other law enforcement trainers, the OC doesn't actually cause temporary blindness, only the shutting of the eyes. If the eyelid is held open with one's thumb and forefinger, one can see to perform tasks that require vision.

After spraying a class of officers with OC, which for obvious reasons is usually done outside, they are typically allowed to rinse the OC off their faces using a garden hose or buckets of water provided for that purpose. Some agencies and academies have made the spraying of trainees with live OC a mandatory part of OC training and qualification, while others have given the trainee the option whether to be sprayed or not. It has typically been mandatory in OC instructor courses of which I am aware.

To give me even greater perspective on the effects of OC than I have from my own personal experience and research, I spoke by phone with colleagues in the law enforcement training world in many parts of the United States, including New York, New Jersey, Pennsylvania, Illinois, Wisconsin, Massachusetts, Texas, Arizona, Oregon, New Hampshire and California. In total, the individuals I queried had experience with or information regarding literally <u>tens of thousands</u> of individuals being sprayed with OC, both in training and in law enforcement incidents. Examples of the agencies involved included the Los Angeles Police Department, the New Jersey State Police, the North Carolina Justice Academy, the New York Bureau of Municipal Police, the Nassau County Police Department, the Pennsylvania Municipal Police Officers Education & Training Commission, the Allentown (PA) Police Academy, the Amarillo Police Department, the Phoenix Regional Police Academy, the New Hampshire State Police Academy, the Milwaukee Sheriff's Office, and others. None of them reported any deaths or incidents of great bodily harm caused by the OC. Clearly, law enforcement, correctional, and security officers and trainees, and OC instructor candidates, would not be sprayed with live OC if it were believed that OC was likely to cause death or great bodily injury.

As mentioned above, in my work as a law enforcement trainer, expert witness, and OC instructor, I have been sprayed with perhaps 6-8 brands and types of OC, including OC in aerosol mist, stream, splatter stream, foam and gel. For a case in which I worked as an expert in Boston about six years ago, I had a video made of me being sprayed very thoroughly with "Disabler 10-13," the type of OC spray used in that incident. Thats product has a 1.4% major

13

capsaicinoid content, and is thus at the strong end of the pepper spray range, with a higher percentage than the MK-46 concentration used at the Capitol Building. After being sprayed, I remained on camera for about 30 seconds before going off screen to flush my face with water. While the experience was hardly pleasant, neither did the heavy exposure to this strong OC produce death or great bodily injury, nor would I have done this if I thought there was any likelihood that it would. At the time I made this video I was 65 years old.

**SSA Gerald Ken Western's Report, and The Dangers of OC.** SSA Western, interviewed by telephone, was at that time employed in the FBI's Physical Training Unit. His own training had included training in the use of OC spray. He himself was sprayed with OC spray in his training as a New Agent, as are all FBI New Agents. He stated that he had been sprayed approximately six times, "and had overseen the administration of OC during training more than 400 times." Regarding the effects of OC, he stated that "OC is designed to affect mucus [sic] membranes; it causes watery and burning eyes, runny nose, burning sensations of the skin, and can cause coughing and some difficulty breathing. Oftentimes, trainees have to manually hold their eyes open in order to see while under the effects of OC." SSA Western's description of the FBI's OC training was very similar to what I have described above. Trainees are exposed to a 2-second burst of OC across their upper face and eyes from two arm lengths away, then must punch a striking pad for 20 seconds and make an arrest on a compliant subject. He stated the purpose of being sprayed is to "educate new Agents on the effects of OC and to show them that they must be able to persevere through the pain and continue to perform law enforcement tasks …"

SSA Western stated that OC used against a law enforcement officer "would be dangerous due to a risk that the officer could become incapacitated and lose control of their weapon," which presumably could then be used against the officer or others. While I agree that, given the circumstances of a particular incident, spraying a law enforcement officer with OC, like Tasing an officer, could possibly incapacitate an officer and allow a suspect to disarm the officer, that is not what happened in this case. The possibility that OC could be used in this way does not render OC, in the manner in which it is normally used or in which it was used on January 6, a deadly or dangerous weapon. Again, if OC were a dangerous or deadly weapon, police would not use it as a non-lethal weapon for subject control and crowd control, nor would they spray officers with it in training such as SSA Western has described. My understanding is that defendant Zachary Johnson did not spray the MK-46 canister of OC at all, he just passed it up through the crowd. There were many other armed officers present in the tunnel when the MK-46 was ultimately discharged. If anyone in the crowd had attempted to disarm an officer – which I have no information was the case – there were other officers present, capable of preventing the disarming, by using deadly force if necessary to do so. A violent criminal suspect can, of course, use many possible techniques to incapacitate an officer for the purpose of attempting to disarm the officer. These techniques could, for example, include performing a leg sweep on the officer to drop the officer to the ground, or applying an arm lock to the officer's arm. The fact that a leg sweep or arm lock might possibly be the prelude to an attempt to disarm the officer does not render either the leg sweep or arm lock "deadly" attacks on the officer, so as to justify the officer's use of deadly force in response, unless and until a disarming attempt is actually made, or until the circumstances otherwise indicate that it is objectively reasonable for the officer to fear a deadly attack by the suspect.

14

SSA Western also stated that "OC is flammable. As a result, the use of defibrillator for someone experiencing a cardiac event is not authorized in an OC contaminated environment. Additionally, the deployment of a taser in a contaminated environment is forbidden due to the risk of ignition." I note that SSA Western's comments in this regard do not apply to the First Defense MK-46 unit involved here. The MK-46 uses a water-based liquid carrier, like many other OC products made in recent years, and is not flammable. The Defense Technology product literature for the MK-46 states that it is "EDW [Taser] Safe," EDW standing for an "electronic discharge weapon" such as the Taser. The Material Safety Data Sheet ("MSDS") for the MK-46 states that the product is "Not generally flammable, as solution is water-based."

Regarding the possibility that the OC itself could cause a serious reaction, SSA Western stated that he observed one instance (out of over 400, as he had stated) of an "unexpected medical reaction" where "an individual suffering from asthma required hospitalization after experiencing an anaphylactic reaction." SSA Western's interview does not indicate that the FBI stopped its practice of pepper-spraying New Agents in training after this single "unexpected medical reaction" with this single asthmatic individual. I note that any number of common items can cause severe allergic or anaphylactic reactions, up to and including death, among hypersensitive individuals. These substances include aspirin, peanuts, shellfish, milk, bee and wasp stings, and many, many others. Other factors besides asthma that have sometimes been viewed as causing or contributing to serious injury or even death of suspects arrested by police have included morbid obesity, violent and prolonged physical struggles with the police, positional asphyxia, overdoses of drugs in the individual's system, and excited delirium. The fact that SSA Western observed one such instance (out of the over-400 applications of OC he witnessed) does not make OC a "deadly or dangerous weapon," defined as one which is "known to be **likely** to produce death or great bodily injury in the manner in which it is used" [emphasis supplied]. See Elaine Jones v. United States, District of Columbia Court of Appeals, 67 A.3d 547 (2013). When SSA Western's one in over 400 instances, involving an asthmatic individual, is combined with the literally tens of thousands of "no serious result" instances reported to me by colleagues, it becomes even more clear that OC is not a "dangerous or deadly weapon."

An NIJ-funded study of 63 instances in which subjects who had been pepper sprayed later died in police custody found that only two of the 63 instances, both involving asthmatic subjects, were instances in which the OC spray "contributed" to the subject's death. In no cases was the OC spray stated to be the cause of death. See, *The Effectiveness and Safety of Pepper Spray*, above. To put this study in proper perspective, one must understand that it starts by selecting for study 63 instances in which suspects arrested by police had later died in police custody – a very tiny fraction of the total number of people pepper sprayed and/or arrested by police.

The majority of scientific and medical studies have concluded that OC spray is completely non-toxic and safe. The *Journal of Investigative Ophthalmology and Visual Science* has concluded that eye exposure to OC is not harmful, and there is no evidence saying pepper spray causes long-term visual problems. See, *How Dangerous is Pepper Spray?*", Essilor News.
One recognized danger of using pressurized OC, especially in stream form, is that if a highly pressurized stream of any substance hits one's unprotected eyeball at very close range, it

15

can cause mechanical injury to the eyeball. This is sometimes called the "ballistic needle effect." It is not specific to OC; the same type of eye injury could be caused by water from a garden hose, air from an air hose, certain children's toy water guns, or other close-range pressurized impact of liquid or gas with one's eye. Almost all of the police officers I observed in the January 6 videos were wearing face shields, and I am not aware of any eye injuries, either to police or demonstrators, resulting from being pepper sprayed directly in the eye at too close a range.

Over the roughly 35 years in which it has been widely used by police throughout the United States, the major danger recognized in its use is the danger that it may not effectively incapacitate the suspect, resulting in injury to the police officer. See *Pepper Spray; Research Insights on Effects and Effectiveness Have Curbed Its Appeal*, National Institute of Justice, May 1, 2019, p.3: "Although OC application was associated with a decrease in subject injuries compared with injuries from other use-of-force options, OC was found to significantly increase officers' injury risk." This is one of the reasons the Taser has largely overtaken OC spray as the police non-lethal weapon of choice in recent years.

The videos of the January 6 incident I reviewed showed both the police and the demonstrators spraying copious quantities of what appears to be OC at one another. I am not informed t hat any of the individuals exposed to OC suffered death or serious bodily injury as a result.

Unlike the sale of firearms, very few states restrict the sale of OC to adults, and it is commonly offered for sale at sporting goods stores, runners stores, big box stores including Walmart and Target, and on Amazon and other internet sources. The general lack of legal restrictions on the sale of pepper spray is yet another indication that it is not a deadly weapon.

It is significant that suspects pepper sprayed by police are not taken to the hospital or provided with other professional medical care as a matter of course, but in most cases are simply allowed to flush their faces with cool water, and sometimes take the other steps listed above to hasten recovery from the effects of the pepper. The U.S. Capitol Police training PowerPoint on OC use, after telling USCP officers to "[r]eassure the subject that the O.C. effects are temporary and that the discomfort will soon subside," instructs USCP officers that "If significant symptoms persist past one hour, seek medical attention for the subject." The Police Policy Studies Council recommends providing medical attention if the symptoms have not abated within 45 minutes, or if the person sprayed requests it. Clearly the fact that individuals pepper sprayed by police are not even given medical care as a standard procedure indicates that pepper spray exposure is <u>not</u> considered likely to result in death or serious bodily harm.

The meaning of "dangerous weapon", as used in Count Two and Count Twelve of the charges against Zachary Johnson, is that the weapon is either "inherently deadly" (such as a gun or knife), or "known to be likely to cause serious bodily injury or death to another person and the defendant must use it in that manner.

I have used many brands and types of OC over the past 30 or more years, and currently have in inventory 60 or more OC units made by various manufacturers. I have attended pepper spray user and instructor classes, and have taught the use of pepper spray to many others. I have

16

read or reviewed numerous OC spray lesson plans, PowerPoints, and law enforcement and security agency policies on the use of pepper spray/OC. To the best of my recollection, not only are **none** of these OC products accompanied by warnings or product literature indicating that they are "likely" to cause death or serious bodily injury, but none of them mention death or serious bodily injury at all. Again, OC is and has been widely used for years as a **non-lethal** subject control and crowd control device by police.

### Concluding Opinions

I have stated many facts and presented many opinions throughout the foregoing report. All of these facts and opinions are to a reasonable degree of professional certainty in my fields of expertise. This section on "Concluding Opinions" is intended to summarize or restate the most significant of my opinions. However, I expect and intend that any or all of the facts and opinions I have stated throughout this report, not just the Concluding Opinions in this section, may be used in the trial of this matter.. That being said, my Concluding Opinions, to a reasonable degree of professional certainty in my fields of expertise, are as follows:

- Pepper spray, or "OC" (oleoresin capsicum) has been widely used since the 1980's by law enforcement and security officers throughout the United States and other countries as a non-lethal control weapon, and by private individuals (non-police or "civilians") for self-defense purposes.

- Pepper spray is not likely to cause death or great bodily injury in the manner in which it is commonly used.

- Specifically, the Defense Technology "First Defense" MK-46 crowd control pepper spray is not likely to cause death or great bodily injury in the manner in which it is commonly used.

- If the "First Defense" MK-46 pepper spray was likely to cause death or great bodily injury, it would not be used by police agencies for crowd control.

I reserve the right to amend or supplement this report, and the facts and opinions contained herein, in the event further information comes to my attention.

Very truly yours,

Emanuel Kapelsohn, President

17